```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION

WIRELESS AGENTS, L.L.C.,         §
                                 §
                    Plaintiff,   §
                                 § Civil Action No. 3:05-CV-0289-D
VS.                              §
                                 §
SONY ERICSSON MOBILE             §
COMMUNICATIONS AB, et al.,       §
                                 §
                    Defendants.  §
```

MEMORANDUM OPINION
AND ORDER

In this patent infringement action concerning United States Patent No. 6,665,173 ("the '173 patent"), entitled "Physical Configuration of a Hand-Held Electronic Communication Device," plaintiff moves for a preliminary injunction, presenting the dispositive question whether it has established a reasonable likelihood of success on the merits. Concluding that plaintiff has failed to show that the accused devices contain an "alphanumeric keyboard," as that term of the '173 patent is properly construed, the court holds that plaintiff has not demonstrated a reasonable likelihood of success on the merits and denies the motion.[1]

---

[1] Plaintiff's preliminary injunction motion is before the court under the procedure permitted by Fed. R. Civ. P. 43(e) and is being decided on the papers, without an evidentiary hearing. *See, e.g., Jones v. Bush*, 122 F.Supp.2d 713, 715 (N.D. Tex.) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (per curiam) (unpublished table decision). Briefing was completed on August 17, 2005, when plaintiff filed its final reply brief (denominated "surreply"). As permitted by Rule 52(a), the court sets out its findings of fact and conclusions of law in this memorandum opinion and order.

I

Plaintiff Wireless Agents, L.L.C. ("Wireless") sues defendant Sony Ericsson Mobile Communications (USA) Inc. ("Sony") for infringing the '173 patent based on Sony's distributing and marketing Sony S700i and S710a mobile phones in the United States, and it moves for a preliminary injunction.[2]  Sony maintains that Wireless is not entitled to a preliminary injunction because its devices do not infringe the '173 patent and, alternatively, because the patent is invalid.

The patented invention attempts to solve various problems associated with conventional wireless communication devices, such as mobile phones, personal digital assistants, handheld computers, and two-way pagers.  According to the patent, some of these devices have inappropriate means of data entry; either the data-entry tool is too small, or data entry is slow and error prone, or an additional peripheral data-entry device is required.  For example, the mobile phone typically has a twelve-digit keypad designed primarily for numeric data entry, although it can also be used for alphanumeric data entry.  The mobile phone's method of entering an alphanumeric character consists of switching the device into text-entry mode, then pressing a key repeatedly to select the desired character from a subset of alphanumeric characters assigned to the

---

[2]Although Sony Ericsson Mobile Communications AB, a Swedish corporation, is also a defendant in this case, Wireless moves for a preliminary injunction only against Sony.

key.  The patent describes this method of data entry as "extremely slow, awkward, error prone, and not appropriate for a device intended to transfer textual data on a regular basis."  P. App. 18. Other devices do have an appropriate means of data entry but not an adequate display: "[T]he device[s] transform[ ] between multiple states[,] which prevent[s] the display from being seen in one of the states, limiting the convenience of using the device on a frequent basis."  *Id.*

The patented invention seeks to improve upon existing wireless communication devices by combining, *inter alia*, a convenient means of data entry and an appropriate display into a single device.  The invention consists of a display portion and a body portion attached to it.  The display portion is relatively large, and the body portion contains an alphanumeric keyboard.  The display portion and the body portion pivot so that the display portion is constantly visible and the alphanumeric keyboard can be concealed until needed.  The invention is designed to be "small enough to carry and convenient enough to use under usage conditions typically encountered with a mobile phone device."  *Id.* at 19.

Sony's devices are mobile phones that also have a display portion and a body portion that pivot.  They contain, *inter alia*, the twelve-digit keypad typical for mobile phones.  Ten keys represent the numerals 0 to 9, with the remaining two keys marked "*" and "#" respectively.  Also, each alphabetic character is

- 3 -

assigned to one of the keys associated with the numerals 2 to 9. Alphanumeric data entry is accomplished by switching to text-entry mode, then pressing a key repeatedly until the desired character is selected. In addition to the twelve standard keys, there are two additional keys: a power key and a "Sony Ericsson Operator Defined Key." D. Resp. Br. 14. Sony markets and sells the accused devices in the United States through its distribution network of retailers, including Cingular and 1800mobiles.com.

Wireless alleges that Sony's devices infringe claims 1, 2, 3, 4, 6, 15, 16, 17, 18, and 19 of the '173 patent. Claim 1 reads:

> A hand-held, electronic computing device having a physical configuration comprising:
> a body portion;
> a display portion pivotally coupled to the body portion;
> a constantly visible display carried by the display portion;
> an alphanumeric keyboard carried by the body portion;
> wherein the alphanumeric keyboard is at least partially concealed by the display portion when not in use; and
> wherein the display portion pivots relative to the body portion in a plane that is generally parallel with the alphanumeric keyboard.

P. App. 24. Claims 2, 3, 4, 6, and 15 are dependent claims that incorporate claim 1. *See id.* Claims 16, 17, and 19 are dependent claims that incorporate claim 15. *See id.* Claim 18 is a dependent claim that incorporates claim 16. *See id.* Thus all the allegedly infringed claims apart from claim 1 are dependent on claim 1.

II

In a patent infringement case, the decision whether to issue a preliminary injunction is within the court's discretion. *Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001); *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).  "A preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'"  *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting *Intel Corp.*, 995 F.2d at 1568).  In deciding whether to grant Wireless' motion, the court considers (1) whether Wireless has demonstrated a reasonable likelihood of success on the merits, (2) whether Wireless will suffer irreparable harm if an injunction is not granted, (3) whether the balance of hardships tips in Wireless' favor, and (4) whether and to what extent granting the injunction would have a positive impact on the public interest.  *See Amazon.com*, 239 F.3d at 1350.  No individual factor is dispositive, and the court "must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested."  *Id.*  For the preliminary injunction to issue, however, Wireless must establish both of the first two elements.  *See id.*

To demonstrate a likelihood of success on the merits, Wireless must show (1) "that it will likely prove infringement of one or more claims" of the '173 patent at trial and (2) "that at least one

- 5 -

of those same allegedly infringed claims will also likely withstand [Sony's] validity challenges." *Id.* at 1351. The preliminary injunction must not issue if Sony raises a substantial question concerning either infringement or validity. *See id.* at 1350-51.

### III

Wireless contends that Sony's devices literally infringe the '173 patent.[3] Literal infringement analysis consists of two familiar steps. First, the court construes the patent to determine the scope of its claims. *Id.* at 1351. Claim construction is a matter of law reserved exclusively for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Second, the court compares the properly construed claims with the accused products. *See Amazon.com*, 239 F.3d at 1351; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed. Cir. 1996). This is a factual determination. *Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002).

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics,* 90 F.3d at 1582). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of

---

[3]Wireless does not contend that Sony's devices infringe the '173 patent under the doctrine of equivalents.

the effective filing date of the patent application." *Id.* at 1313.[4]

> The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art.

*Id.* at 1314 (citations omitted). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* In other instances, however, "the meaning of a claim term as understood by persons of skill in the

---

[4]Wireless maintains that its expert, Dr. Gerhard Deffner ("Dr. Deffner"), is "a person of at least ordinary skill in the art." P. Br. 7. Dr. Deffner opines that a person of ordinary skill in the art at the time of the filing of the '173 patent "would typically have had at least a baccalaureate degree applicable to one or more of the following fields: human factors, ergonomics, computer science, and industrial design." P. App. 300. In addition, the person "would have had several years of experience in the design and the evaluation of hand-held computing devices." *Id.* Sony challenges Dr. Deffner's expert opinions on several grounds, but it does not contest that he is a person of ordinary skill in the art or his definition of who would be such a person.

art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (quoting *Innova*, 381 F.3d at 1116). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.*

"The claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (citations omitted) (quoting *Markman*, 52 F.3d at 978, 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics,* 90 F.3d at 1582). "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for

- 8 -

guidance as to the meaning of the claims." *Id.* at 1317.

"In addition to consulting the specification, [the] court 'should also consider the patent's prosecution history, if it is in evidence.'" *Id.* (quoting *Markman,* 52 F.3d at 980).

"Although [the Federal Circuit has] emphasized the importance of intrinsic evidence in claim construction, [it has] also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* (quoting *Markman,* 52 F.3d at 980). "However, while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining "the legally operative meaning of claim language."'" *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed. Cir. 2004); *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1318 (Fed. Cir. 2004)).

> [E]xtrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field.

*Id.* at 1318.

> However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent."

*Id.* (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)). The Federal Circuit has "viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms. . . ." *Id.*

### IV

#### A

The court begins by construing claim 1 of the '173 patent. In doing so, the court emphasizes that this construction is tentative, based on the preliminary record before the court. The court retains the authority to construe the claims differently at a later stage and on a more complete record. *See Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1345 n.3 (Fed. Cir. 2003) ("[A] district court can issue 'tentative' or 'rolling' claim constructions when 'faced with construing highly technical claim language on an expedited basis,' such as in a preliminary injunction proceeding. . . .") (quoting *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002)); *Sofamor Danek Group, Inc. v. Depuy-Motech*, Inc., 74 F.3d 1216, 1221 (Fed. Cir. 1996) ("[T]he

trial court has no obligation to interpret claim[s] conclusively and finally during a preliminary injunction proceeding.").

B

The court need only construe the term "alphanumeric keyboard" within claim 1 to decide the preliminary injunction application.[5] Wireless proposes the following construction: "[A]n 'alphanumeric keyboard' is a regular arrangement of keys. When activated, these keys are used to generate the internal representation of symbols. 'Alphanumeric' symbols include letters of the alphabet and numbers 0-9. 'Alphanumeric keyboards' allow the generation of internal representations for this set of symbols." P. Reply Br. 8 (quoting Dr. Deffner Report ¶ 31, P. App. 306). Sony submits the following proposed construction: "An input device having a QWERTY, FITALY, or Dvorak layout or any other alphanumeric layout that includes a substantially full set of alphabetic and numeric keys." D. Br. 8 (emphasis omitted).

To support its proposed construction, Wireless relies exclusively on extrinsic evidence—primarily the report of its

---

[5]Wireless has submitted proposed constructions for ten terms within claim 1. For purposes of Wireless' preliminary injunction application, Sony does not dispute the proposed constructions of seven of the ten terms, but it does challenge the proposed constructions of three—"hand-held," "body portion," and "alphanumeric keyboard"—and maintains that a fourth term—"high resolution"—needs to be interpreted. Of these, the court need only construe the term "alphanumeric keyboard" to conclude that Wireless is not entitled to injunctive relief.

expert, Dr. Gerhard Deffner ("Dr. Deffner").[6]  The Federal Circuit generally views extrinsic evidence as "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Phillips*, 415 F.3d at 1318.  The language of Wireless' proposed construction comes directly from Dr. Deffner's report.  The report states in conclusory terms that the proposed construction is how "[a] person of ordinary skill in the art would understand" the term.  P. App. 306.  But "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to [the] court."  *Phillips*, 415 F.3d at 1318.

In contrast to Wireless' reliance on extrinsic evidence, Sony points primarily to the patent specification to support its proposed construction.  Indeed, the text of its proposed definition comes directly from the specification.  *Compare* D. Br. 8 *with* P. App. 20.

---

[6]Wireless also points to various technical dictionaries to support its proposed construction.  Under *Phillips* the court may review technical dictionaries "if the court deems it helpful." *Phillips*, 415 F.3d at 1318.  Because the court is able to construe the disputed claim term based on intrinsic evidence, it need not resort to technical dictionaries.  *See Vitronics*, 90 F.3d at 1583 (If "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term . . . , it is improper to rely on extrinsic evidence.").

In addition, Wireless points to allegedly inconsistent positions that Sony and its expert, Dr. Brad A. Myers ("Dr. Myers"), have taken in other patent proceedings.  This is also extrinsic evidence because it is external to the '173 patent and its prosecution history.  *See Phillips*, 415 F.3d at 1317.

C

Because the meaning of the claim term "alphanumeric keyboard" as understood by persons of skill in the art is not immediately apparent, the court will interpret it by considering the intrinsic evidence. *See Vitronics*, 90 F.3d at 1582 ("It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record. . . ."). The court turns first to the specification of the '173 patent. The "Background of the Invention" section of the specification summarizes the configurations of several conventional wireless communication devices, including the mobile phone. It describes the mobile phone as typically including, *inter alia*, "a twelve-digit keypad designed for numeric data entry." P. App. 18. It then details shortcomings with each of the conventional wireless devices. It describes the following fundamental disadvantage with the mobile phone's twelve-digit keypad. Although the twelve-digit keypad usually supports some alphanumeric data entry,

> the commonly used method of accessing alphanumeric characters is to switch the device into a text entry mode, then press a key repeatedly to access a particular one of a subset of characters available for each key, this method being extremely slow, awkward, error prone, and not appropriate for a device intended to transfer textual data on a regular basis.

*Id.*

The "Summary of the Invention" section distinguishes between

the invention's alphanumeric keyboard and the mobile phone's keypad. "The alphanumeric keyboard is easier and faster to use and learn than the keypads . . . on most mobile phones. . . ." *Id.* at 20.  It describes the alphanumeric keyboard as follows: "The keyboard may be a keyboard with a layout such as the common 'QWERTY' layout, but need not be limited to this particular layout. Other layouts may include the 'FITALY' layout, the 'Dvorak' layout[,] or any other alphanumeric layout that includes *a substantially full set of alphanumeric keys*." *Id.* (emphasis added).  The specification explains the primary advantage of the invention's keyboard.  In contrast to data entry using the mobile phone's twelve-digit keypad, which is "extremely slow, awkward, [and] error prone," *id.* at 18, the invention's "full alphanumeric keyboard allows the user to quickly and easily transmit messages and other textual and graphical communications in a complete and intuitive manner," *id.* at 20, and is "effortless to learn and use," *id.*[7]

Based on the intrinsic evidence, the court rejects Wireless' proposed construction of "alphanumeric keyboard."  The patent specification unambiguously distinguishes between the invention's keyboard and the mobile phone's standard twelve-digit keypad. Because Wireless' proposed construction——"a regular arrangement of

---

[7]Neither party has adduced evidence of the patent's prosecution history.  Thus the specification is the only intrinsic evidence that the court will consider.

- 14 -

keys"——would include the twelve-digit keypad, it is simply too broad. Instead, the court adopts Sony's proposed construction, which is taken directly from the language of the patent specification.

Wireless contends that the court's adoption of Sony's proposed construction would be improper because it would use the patent specification to limit the scope of the claims. The court recognizes that it is prohibited from "limiting the claimed invention to preferred embodiments or specific examples in the specification." *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). The court also "recognize[s] that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." *Phillips*, 415 F.3d at 1323. But because the court's analysis does not refer to the patent's preferred embodiment or to the numerous specific examples of other embodiments listed within the patent, the court is satisfied that it is relying on the specification to interpret the claims, not to improperly limit them.

D

The claims of the '173 patent do not read on the accused products. The Sony devices do not have an "alphanumeric keyboard," as the term is properly construed. Rather, they incorporate a typical twelve-digit numeric keypad, a power key, and a Sony operator-defined key. Like standard mobile phone keypads, the keys associated with the numerals 2 through 9 are also capable of inputting alphabetic characters in a text-entry mode. But the specification makes clear that this is the keypad configuration that suffers from the problems that the inventors sought to overcome by incorporating an alphanumeric keyboard that employs a substantially-full set of alphanumeric keys. Thus the court concludes on the present record that Wireless has failed to establish that it will likely prove infringement of claim 1 at trial. The remaining asserted claims are dependent on claim 1. Because dependent claims necessarily include all limitations of the claims on which they depend, Wireless has not demonstrated that it will likely prove infringement of any of the asserted dependent claims at trial.

The intrinsic evidence provides adequate grounds for the court to construe the term "alphanumeric keyboard." Accordingly, the court does not rely on any extrinsic evidence, including expert reports. *See Vitronics*, 90 F.3d at 1583 (If "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed

claim term . . . , it is improper to rely on extrinsic evidence.").

V

Wireless has not demonstrated that it will likely prove infringement of any claim of the '173 patent at issue. The court need not therefore consider Sony's challenges to the patent's validity. Even assuming *arguendo* that the patent is valid, Wireless has not met its burden of showing a reasonable likelihood of success on the merits. Without this showing, Wireless is not entitled to a preliminary injunction, and the court need not consider the remaining three factors. *See Amazon.com*, 239 F.3d at 1350 ("[A] movant cannot be granted a preliminary injunction unless it establishes . . . likelihood of success on the merits. . . .").

\*   \*   \*

For the reasons stated, the court denies Wireless' April 28, 2005 motion for preliminary injunction.[8]

**SO ORDERED.**

September 27, 2005.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[8] Sony's objection to Wireless' confidential appendix to its August 17, 2005 final reply (denominated "surreply") is denied as moot, because the court has not relied on any portion of the confidential appendix in denying Wireless' preliminary injunction motion.

Wireless filed on September 21, 2005 a motion to strike the testimony of Dr. Myers. The motion is limited to the court's consideration of Wireless' motion for preliminary injunction. The court denies the motion as moot, because it has not relied on his opinion testimony. In other words, although the court's reasoning is in several respects consistent with Dr. Myers' opinions, the court has reached its conclusions independently, without relying on his expert testimony.